IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| ARLESTER NEWSOME, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CIVIL ACTION NO. 1:06CV624-SRW |
| ) | (WO) |
| MICHAEL J. ASTRUE, Commissioner ) | |
| of Social Security, ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM OF OPINION**

Plaintiff Arlester Newsome brings this action pursuant to 42 U.S.C. § 405(g) seeking judicial review of a decision by the Commissioner of Social Security ("Commissioner") denying his application for disability insurance benefits under the Social Security Act. The parties have consented to entry of final judgment by the Magistrate Judge, pursuant to 28 U.S.C. § 636(c). Upon review of the record and briefs submitted by the parties, the court concludes that the decision of the Commissioner is due to be affirmed.

**BACKGROUND**

On October 28, 2003, plaintiff filed an application for disability insurance benefits. On September 13, 2005, after the claim was denied at the initial administrative levels, an ALJ conducted an administrative hearing. The ALJ rendered a decision on October 25, 2005. The ALJ concluded that plaintiff suffered from the severe impairments of low back syndrome secondary to degenerative disc disease, carpal tunnel syndrome bilaterally, and diabetes mellitus. (R. 17). He found that plaintiff's impairments, considered in combination, did not

meet or equal the severity of any of the impairments in the "listings" and, further, that plaintiff retained the residual functional capacity to perform jobs existing in significant numbers in the national economy. Thus, the ALJ concluded that the plaintiff was not disabled within the meaning of the Social Security Act. On May 13, 2006, the Appeals Council denied plaintiff's request for review and, accordingly, the decision of the ALJ became the final decision of the Commissioner.

## STANDARD OF REVIEW

The court's review of the Commissioner's decision is narrowly circumscribed. The court does not reweigh the evidence or substitute its judgment for that of the Commissioner. Rather, the court examines the administrative decision and scrutinizes the record as a whole to determine whether substantial evidence supports the ALJ's factual findings. Davis v. Shalala, 985 F.2d 528, 531 (11th Cir. 1993); Cornelius v. Sullivan, 936 F.2d 1143, 1145 (11th Cir. 1991). Substantial evidence consists of such "relevant evidence as a reasonable person would accept as adequate to support a conclusion." Cornelius, 936 F.2d at 1145. Factual findings that are supported by substantial evidence must be upheld by the court. The ALJ's legal conclusions, however, are reviewed *de novo* because no presumption of validity attaches to the ALJ's determination of the proper legal standards to be applied. Davis, 985 F.2d at 531. If the court finds an error in the ALJ's application of the law, or if the ALJ fails to provide the court with sufficient reasoning for determining that the proper legal analysis has been conducted, the ALJ's decision must be reversed. Cornelius, 936 F.2d at 1145-46.

## DISCUSSION

The plaintiff challenges the Commissioner's decision, arguing that: (1) the ALJ erred by failing to consider the effect of plaintiff's muscle spasms and jerking on his ability to maintain sustained employment; and (2) the Appeals Council erred by failing to remand plaintiff's case to the ALJ based on the clarified opinion of plaintiff's treating physician.

### Plaintiff's Muscle Spasms

At the hearing, the plaintiff testified that he has muscle spasms in his back, hands, arms and legs. He testified that they cause his legs to shake, his hands to "draw shut" and his arms to "draw to a certain point" and that they are painful. (R. 355-57). Plaintiff testified that "a lot of time" his muscle spasms "grab" him and "locks [his] whole body," and that he cannot move until "it turns [him] loose," sometimes for ten minutes. (R. 382).

On March 1, 2002, plaintiff visited Dr. Chitwood, an orthopedic specialist, with complaints of back pain.[1] In a visit on March 22, 2002, Dr. Maddox noted, "He is having some unusual spasms that cause a jerking sensation in his low back. This is somewhat atypical, but quite notable here in the clinic." (R. 177). On April 19, 2002, plaintiff returned to Dr. Maddox who reported that the MRI showed "significant discogenic stenosis at L4-5 due to a central protrusion of this degenerative disk." Dr. Maddox indicated that the patient may require surgery, but he was hopeful that plaintiff could be managed non-surgically. (R. 176). On June 11, 2002, plaintiff returned to Dr. Maddox, reporting that the epidural had

---

[1] Since plaintiff had previously been treated by Dr. Maddox, another orthopedic specialist in the same practice group (in January and February 1999 and in May 2000), Dr. Chitwood referred plaintiff to Dr. Maddox for further treatment. (R. 179-180).

helped for only a couple of days, and that medication and physical therapy had not helped. Dr. Maddox discussed the possibility of a discogram. He also noted:

> Teresa mentioned that after I left he really focused on the fact that he was looking for disability. I don't know that we have a basis for this with what we have. I will look at the awake discography and we will try to make appropriate recommendations for this patient. I think it is probable that he will not be a candidate for unrestricted heavy labor as he has significant stenosis and at least one degenerative disc. I certainly don't see anything that would make me think him incapable of employment.

(R. 175).

On February 21, 2003, plaintiff sought treatment from Dr. R. Michael O'Brien at First Med of Dothan. He reported "at least a two year history of muscle spasms that have become progressive. They began in the left arm with a shaking of the hand at times. Now has jumping of arms and legs. Also some spasm in the neck and the low back particularly painful at this time in the right shoulder." On examination, Dr. O'Brien noted, "Patient jumps irregularly. Sometimes has rhythmic tremor of hand and at other times has spasm in back and drawing of his hands." Dr. O'Brien sent plaintiff for a CT scan, which returned normal results (R. 243, 263), and referred plaintiff to Dr. Joey Bosier for a neurology consultation. (R. 344).

Plaintiff visited Dr. Bosier on February 28, 2003, complaining of "tremors affecting the entire body." On musculoskeletal examination, Dr. Bosier indicated, "The patient complained of myalgias with tenderness to palpation, particularly on the trapezius regions bilaterally. He states that on occasion his right shoulder will 'draw up' uncontrollably." In the neurologic examination, he noted, "The patient would have involuntary jerking of various

muscle groups without loss of consciousness during the examination. These appeared to be individual myoclonic jerks rather than any sei[zure] like activity." However, on percussion of various muscle groups – including the paraspinals in all regions of the back, the pectorals, anterior thigh, deltoids, biceps, triceps, and gastrocnemius – Dr. Bosier was unable to elicit any form of percussion myotonia or fasciculation. (R. 186). Dr. Bosier suggested possible causes of polymyositis, inflammatory myopathies, and autoimmune disease. He ordered blood work, and EMG and nerve conduction studies by Dr. Clifton to rule out a myopathic process. (Id.).

When plaintiff returned to Dr. Bosier on March 20, 2003, he had not had the EMG or nerve conduction study, and some of his lab work was not completed. His ANA was negative, however, his rheumatoid factor was less than 10, and his sedimentation rate was "only 6." He had an elevated CK (creatine kinase) total of 302. Dr. Bosier suspected "myopathy of unknown type. He stated, "The elevated CK in the absence of known trauma in a patient with painful muscles is certainly suggestive of a myopathy but his data base is still uncompleted. We will continue to pursue this at this time." He noted, "The patient exhibits a flapping, rather unusual tremor today that is fairly [sic] in amplitude. This does not appear to [be] anything that is dystonic, epileptiform, or choreoatheotoid. Tone remains preserved throughout this and when he tries to stop it he also tends to contract the upper arm as well." (R. 183).

Plaintiff returned to Dr. Bosier on April 1, 2003 for reassessment. Dr. Bosier's letter to Dr. O'Brien states:

> Dr. Clifton performed his EMG/NCS on 3/24/03 and only found evidence for bilateral median mononeuropathies at the wrist which clinically correlated for carpal tunnel syndrome. However, he found no evidence of myopathy, cervical radiculopathy or cubital tunnel syndrome.
>
> His lab work final came back with an elevated aldolase level, normal angiotensin converting enzyme (ACE) levels, negative RPR, ANA and rheumatoid factor.

(R. 181). He stated, "He still has the rather unusual high amplitude pronation/supernation type tremor that is intermittent. The remainder of his exam is remarkable for proximal muscle weakness." Dr. Bosier noted that the "clinical suspicion of myopathy remains high with myalgias, proximal muscle weakness, elevated CK and elevated aldolase. Due to the lack of d[e]finite etiology, I will send him for further evaluation to the University of Alabama at Birmingham." He further stated, "[d]ue to the protean nature of this problem, I am unable to offer anything more for this patient. He asked about assistance with disability determination but I advised him to wait until an etiology has been found for his complaints." (R. 181).

On June 3, 2003, plaintiff was evaluated by Dr. Hewitt Ryan of the UAB School of Medicine Department of Neurology. Dr. Ryan noted that plaintiff was referred by Dr. Bosier after serologic evaluation revealed "mildly elevated" CK and aldolase levels. (R. 189). On examination, Dr. Ryan noted that plaintiff "does appear to have some muscle spasm along the paraspinal muscles bilaterally." (R. 190). He also noted some crepitus in the knee joints bilaterally and the TMJ joint. He stated, "The patient had giveaway weakness in both the upper and lower extremities and during the course of evaluation there appeared to be a functional tremor that would be prominent in the limb that was being examined for both

6

motor strength, as well as with sensory evaluation and deep tendon reflex testing." Dr. Ryan noted:

> He has had a mildly elevated CPK, and myopathy or idiopathic CPKemia is a possibility. On examination today, the patient does appear to have muscle fullness of the lumbar paraspinal muscles. Will plan [sic] perform EMG nerve conduction studies to evalate for myopathy versus radiculopathy and also perform an MRI of the lumbar spine to evaluate for any evidence of lumbar stenosis or arthritis to explain the symptom. The patient on examination today does have a very prominent functional tremor for which I have no neurologic explanation for [sic]. We will plan to check a repeat CK level as well as thyroid functions, as well as the sedimentation rate, ANA and the rheumatoid factor to look for any contributing factors. Should patient be found to have a persistently elevated CPK level, may consider pursuing a muscle biopsy if needed given the question of myopathy. It is a possibility that patient may have a elevated CPK due to muscle contration [sic] or idiopathic CPKemia but this would be a diagnosis of exclusion. I have asked the patient again to ask other family members in the family to see if other people may not have myalgia or weakness symptoms, which he is not aware. We will plan to contact patient in regard to the results of the studies with further recommendations made at that time in regard whether or not to pursue a muscle biopsy at this time.

(R. 190-91).

The EMG and nerve conduction study were conducted on June 23, 2003. The findings were "indicative of bilateral carpal tunnel syndrome and right L5 chronic radiculopathy." There was "some increased muscle membrane irritability," but "no definite electrophysiologican findings of myopathy." (R. 192). The lumbar spine MRI on the same day showed "[d]egenerative changes at L4-5 with mild spinal stenosis of probably bilateral L5 nerve root compression[.]" (R. 196).

Dr. Ryan referred plaintiff to Dr. Thompson, a neurosurgeon, for evaluation of his low back pain. Dr. Thompson's report of his initial evaluation of plaintiff on September 17, 2003

does not mention muscle spasms or tremors. After review of plaintiff's MRI, which showed degenerative disc disease between L-4 and S-1, and after plaintiff's lumbar flexion and extension x-rays were "essentially normal," Dr. Thompson advised plaintiff in a September 24, 2003 letter, "I believe that you will obtain your most benefit through exercise in order to strengthen your back and abdomen. As we discussed, agents such as Motrin and Tylenol will be useful for the management of low back pain as well. I would not recommend any surgery to you." (R. 198-201).

On November 18, 2003, plaintiff was hospitalized by Dr. John Stone for three days because of extremely high blood glucose levels. (R. 206). In his report of physical examination, Dr. Stone noted "chronic back pains" but "no arthralgias, bone pain, myalgias or muscle cramps." He specifically noted "no tremor" on examination of plaintiff's extremities. (R. 207). Under "social history," Dr. Stone recorded "He is presently out of work and feels like he is disabled from his chronic back problems." (Id.). Under "past medical history," there is no mention of tremors or spasms (R. 206), and the discharge summary does not note any tremors or spasms during the hospitalization. (R. 204-05).

On November 3, 2003, the plaintiff reported to the emergency room complaining of muscle spasms in his neck, shoulder and back, and frequent urination. The physical examination specifically documented a normal examination of plaintiff's back, and noted no abnormalities other than an enlarged prostate. (R. 235-36). On June 2, 2004, plaintiff went to the emergency room complaining of back pain. The physician noted tenderness on examination of plaintiff's neck and lower back, but no muscle spasms and no apparent motor

8

deficit. (R. 231-32).[2] Dr. Stone, the endocrinologist who treats plaintiff, noted that plaintiff has chronic low back pain (R. 269, 273, 275, 276) but made no observations regarding muscle spasms or tremors in physical examinations conducted on February 16, 2004, May 18, 2004, July 29, 2004, September 29, 2004, or January 3, 2005. (R. 269-76).

The ALJ determined that plaintiff has muscle spasms associated with low back pain. However, he rejected plaintiff's complaints of "generalized muscle spasms not exclusively or primarily related to his back condition," concluding that "the medical evidence does not show an anatomical or physiological abnormality that could reasonably be expected to produce the alleged symptoms[.]" (R. 19). The ALJ relied on the negative CT scan, electrodiagnostic studies which showed no evidence of myopathy, and the inability of neurology specialists to arrive at an etiology or neurological explanation for plaintiff's spasms and tremors. (R. 19-20). Plaintiff argues that the spasms exhibited by plaintiff in his physicians' offices are themselves "objective sign[s]" because they are visible to the physicians. (Doc. # 12, p. 8). However, "[s]igns must be shown by medically acceptable clinical diagnostic techniques." 20 C.F.R. § 404.1528(b). Plaintiff's counsel argued before the ALJ that the physicians "could actually palpate [plaintiff's] muscle spasms." (R. 383). However, upon close examination of the record, it appears that the only spasms which were actually palpated by the physicians were the spasms in plaintiff's back. (See R. 177, 190 and, possibly, R. 344). As noted above, the ALJ found that the claimant suffered from back spasms associated with low back pain. In a June 13, 2005 letter to plaintiff's attorney to

---

[2] Plaintiff was treated in the emergency room on December 15 and 17, 2004, after he shot a nail through his hand with a nail gun. (R. 222-28).

9

document plaintiff's alleged inability to work, plaintiff's treating family practice physician, Dr. Meadows, notes that "[t]his patient is complaining of severe back pain, lower back pain and discomfort, and he has episodes of spasms in his lower back with pain radiating down his legs." (R. 284). Dr. Meadows does not mention tremors or spasms other than in plaintiff's back in this letter. (Id.). Substantial evidence supports the ALJ's conclusion that plaintiff does not suffer from a medically determinable impairment of generalized muscle spasms not exclusively or primarily related to his back condition.[3]

## New Evidence

Plaintiff contends that the Appeals Council erred by failing to remand this case to the ALJ based on the "clarified opinion" of Dr. Meadows. In order to prevail on a claim for remand under sentence six of § 405(g), a plaintiff must show that (1) there is new, non-cumulative evidence; (2) the evidence is material, that is, relevant and probative so that there is a reasonable possibility that it would change the administrative result; and (3) there is good cause for failure to submit the evidence at the appropriate administrative level. Falge v. Apfel, 150 F.3d 1320, 1323 (11th Cir. 1998).

A June 13, 2005 letter to plaintiff's attorney from Richard V. Meadows, D.O, reads, in its entirety:

> I am writing this letter at the request of my patient, Arlester Newsome, to document his inability to work. This patient is complaining of severe back pain, lower back pain and discomfort, and he has episodes of spasms in his lower back with pain radiating down his legs. He states that because of this,

---

[3] Additionally, the evidence before the ALJ of physicians' reports of tremors or of muscle spasms other than those associated with back pain are confined to the period before the alleged onset date of August 15, 2003.

10

>  and his other medical problems, which include insulin dependent diabetes and hypertension, he is not able to be employed and is not able to work. In addition to this, the patient does complain of bilateral shoulder pain, and I suspect has rotator cuff injury in his shoulders. This also complicates his ability to perform gainful employment.
>
>  I hope that this patient does improve, however, at this time, it is my opinion that he is not able to work and hold adequate employment. I hope this information is helpful.

(R. 284). The ALJ considered and rejected Dr. Meadows opinion. He reasoned:

>  The undersigned considered the statement of the claimant's primary care physician, Dr. Meadows dated June 13, 2005, in a letter to the claimant's attorney. Dr. Meadows opined that the claimant is "not able to work and hold adequate employment." The undersigned can give the doctor's opinion no weight. Although Dr. Meadows has been the claimant's primary care provider since 1996 (Exhibit 2E, p. 4), he provided no objective medical evidence, rationale, or clinical observations in support of his opinion. In the statement Dr. Meadows relates the claimants' subjective complaints, which are clearly reported as such rather than as the doctor's conclusions. Dr. Meadows's treatment record does not provide clinical findings or corroborate treatment of a level and intensity that would support disabling symptoms.

(R. 25). The ALJ rendered his decision on October 25, 2005. (R. 27). On January 20, 2006, nearly three months later, plaintiff's attorney wrote to Dr. Meadows requesting additional information. Dr. Meadows responded to plaintiff's attorney by letter dated February 20, 2006. (R. 345-46). Plaintiff submitted this letter to the Appeals Council. The Appeals Council considered the letter but, on May 13, 2006, denied review of the ALJ's decision. (R. 4-7, 345-46).

Plaintiff argues that Dr. Meadows' new letter required remand to the ALJ. He argues that it is new and noncumulative because the letter did not exist when the ALJ issued his opinion. As to materiality, plaintiff argues:

11

> In Mr. Newsome's case, the new evidence includes a more detailed analysis from Mr. Newsome's treating physician about Mr. Newsome's limitations. Previously, Dr. Meadows' assessment was written without specific details as to the basis for the objective findings supporting his conclusion that Mr. Newsome was unable to work. The new evidence discusses in detail the objective findings and the resulting limitations supported by these findings. The ALJ specifically complained about the lack of discussion in Dr. Meadows' initial assessment of the objective evidence. Tr. 25. The updated letter specifically explains Dr. Meadows' objective basis for his opinion. Had the ALJ had the opportunity to review Dr. Meadows' more detailed opinion, there is a reasonable possibility that the ALJ's decision would have been different in this case.

(Doc. # 12, p. 13). With regard to the "good cause" requirement, plaintiff argues:

> As to good cause, Mr. Newsome submitted an assessment from his treating provider and the ALJ chose to reject it. The ALJ could have contacted Dr. Meadows for clarification, but instead, the ALJ simply discredited his earlier opinion. The undersigned had no way to know that the opinion would be rejected. Mr. Newsome submitted Dr. Meadows' clarified opinion to the Appeals Council after he realized the ALJ rejected Dr. Meadows' opinion essentially for not being complete.

(Doc. # 12, pp. 13-14).

Plaintiff has failed to demonstrate good cause for his failure to submit a properly supported opinion from Dr. Meadows to the ALJ at the appropriate time. While the non-existence of evidence at the time of the ALJ's decision may constitute good cause for such a failure, the Eleventh Circuit has concluded that the good cause requirement reflects a congressional determination to prevent the bad faith manipulation of the administrative process. Blake v. Massanari, 2001 WL 530697, *9 (S.D.Ala. 2001) (citing Milano v. Bowen, 809 F.2d 763, 767 (11th Cir. 1987)); see also Beech v. Apfel, 100 F.Supp.2d 1323, 1335-1336 (S.D. Ala. 2000). The good cause requirement was designed to prevent claimants from attempting to withhold evidence or encouraging them to seek after-acquired evidence, and

then use such evidence as an unsanctioned "backdoor" means of appeal. Id. The good cause standard must be applied in light of this purpose. Id. Thus, for example, good cause is not present if the plaintiff procrastinated in obtaining copies of evidence readily obtainable. Blake, *supra*, (citing Caulder v. Bowen, 791 F.2d 872, 879 (11th Cir. 1986)).

In Falge, as in the present case, the claimant produced an additional report from his treating physician after the ALJ's decision, but before the Appeals Council denied review. Falge, *supra*, 150 F.3d at 1322. The new report was not prepared until after the ALJ's decision. Id. at 1323 n. 8. Despite the fact that the report did not actually exist until after the ALJ issued his decision, the Eleventh Circuit found that the claimant had not established "good cause" why the report was not made available during proceedings before the ALJ. Id. at 1323. The Eleventh Circuit noted that "[t]he opinions set out in the report . . . seem to have been based on medical examinations and tests conducted before the ALJ rendered his decision." Id. at 1323 n. 8.

Likewise, in the present case, the opinion of disability offered by Dr. Meadows is clearly based on examinations and tests conducted well before the ALJ issued his decision.[4]

---

[4] Dr. Meadows relies primarily on a 2002 MRI and a course of medical treatment predating the ALJ's decision. The only "new" evidence referenced in Dr. Meadows' two-page letter is his description of his February 14, 2006 evaluation of the plaintiff. Dr. Meadows noted plaintiff's complaints of severe back pain with spasms in his back and legs, and that plaintiff was having "jerking type spasms" in his back muscles. He also noted trembling of plaintiff's legs when he was asked to perform strength testing, deep tendon reflexes of 1/4, high blood pressure, and poorly controlled diabetes. (R. 345-46). While the results of this examination are "new" – since the office visit did not occur until after the ALJ's decision – the noted results are both cumulative and not material. Based on timely-submitted evidence, the ALJ found that plaintiff suffers from "essential hypertension, which has been in poor control" and the severe impairment of diabetes mellitus. Dr. Meadows' February examination did not yield results different from those already in the record before the ALJ. See, *e.g.,* R. 190 (neurologist's June 2003 finding of "deep tendon reflexes of "1/4 throughout" and "functional tremor that would be prominent in the limb that was being examined" for motor strength); R. 340 (blood pressure of 162/110 during August 3, 2005 visit to endocrinologist); R. 339 (Dr.

Plaintiff does not argue otherwise, instead acknowledging that the new letter provides the detailed analysis found lacking in Dr. Meadows' initial opinion of disability. See Fouch v. Barnhart, 2003 WL 22596015, **4 n. 6 (3rd Cir. Sept. 11, 2003)("The letter is probably not 'new' evidence because, as [plaintiff] concedes, the purpose of the letter is to 'clarify' Dr. Ortoski's opinion at the ALJ hearing."). The court cannot accept plaintiff's argument that he had "no way to know" that the previous, conclusory opinion would be rejected by the ALJ. Plaintiff was represented at the hearing by his present attorney – one who is experienced in representing Social Security claimants. It is well-established in this circuit that an ALJ may reject the conclusory opinion of a treating physician. See Phillips v. Barnhart, 357 F.3d 1232, 1241 (11th Cir. 2004). Dr. Meadows had treated plaintiff since at least August 1996. (R. 101, Exhibit 9F). Plaintiff has not established good cause for his failure to obtain and submit a properly supported medical opinion from Dr. Meadows before the ALJ issued his opinion. The Appeals Council did not err by failing to remand the claim to the ALJ on the basis of Dr. Meadows' "clarified opinion."

## CONCLUSION

Upon review of the record as a whole, the court concludes that the decision of the Commissioner is due to be AFFIRMED. A separate judgment will be entered.

---

Meadows' July 2005 examination noting muscle spasms); R. 285 (noting jerking with back spasms in June 2005). Thus, there is no reasonable possibility that the only new evidence contained in the letter – the description of the February 2006 examination – would change the ALJ's decision. See Plaintiff's brief, Doc. # 12 at p. 13 ("The new evidence [Dr. Meadows' February 2006 letter] also relates to the time period on or before the date of the ALJ's decision since the evidence is dated shortly after the ALJ issued his decision and does not refer to any new intervening events – Mr. Newsome's condition has been relatively consistent.").

14

Done, this 20th day of August, 2007.

                                                /s/ Susan Russ Walker
SUSAN RUSS WALKER
UNITED STATES MAGISTRATE JUDGE